

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 10, 2014**

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **Case No. 13-33860-BJH** |
| | § | **(Chapter 13)** |
| NOCONA WHITE, | § | |
| | § | **Related to Dkt. No. 76** |
| DEBTOR. | § | |

## FINDINGS OF FACT AND CONCLUSION OF LAW
## <u>RELATING TO ORDER TO SHOW CAUSE</u>

On March 10, 2014, Thomas D. Powers, Standing Chapter 13 (the "**Trustee**"), filed the

Trustee's Motion for Show Cause Order [Dkt. No. 75] (the "**Motion**"), which this Court granted

on March 13, 2014 [Dkt. No. 76] (the "**Order to Show Cause**").  In the Order to Show Cause,

the Court directed that Angela Maple Ward ("**Maple-Ward**"), Kenneth Middleton Ward

("**Ward**" and, together with Maple-Ward, the "**Wards**"), and debtor Nocona White ("**Mrs.**

**White**" or the "**Debtor**") appear before this Court to explain various transactions involving

multiple property transfers and bankruptcy proceedings involving Mrs. White and the Wards.

An evidentiary hearing on the Order to Show Cause was held on May 19, 2014 and June 13, 2014 (the "**Hearing**"). The following individuals appeared before the Court during the Hearing: the Trustee; Elizabeth Ziegler on behalf of the Office of the U.S. Trustee; Mrs. White, individually and through her attorney of record, Gwendolyn Hunt ("**Hunt**"); and the Wards, each individually and through their attorney of record, Robert Nicoud. Based on the pleadings filed in connection with the Order to Show Cause and the testimony, evidence, and oral argument presented at the Hearing, the Court makes the following findings of fact and conclusions of law.[1]

## I. FINDINGS OF FACT

### A. The Relationship Between the Wards and Mrs. White

1.      Dewell and Nocona White were married on October 12, 1968. Tr. Ex. 4.[2] In 1975, they purchased a home at 2111 Tulane Drive, Richardson, Texas (the "**Tulane Property**"), executing a promissory note in the amount of $41,950 payable to Southern Trust & Mortgage Company and granting a mortgage lien to secure repayment of the note. Tr. Exs. 1, 2. Mr. White was self-employed and built pools, while Mrs. White was a first grade teacher. Hr'g Tr. (5/19/14) 23:18-24:1 (White).[3] Mr. White died in 1998. Tr. Ex. 4. Mrs. White has no surviving children or other relatives. *Id.*; Hr'g Tr. (5/19/14) 27:10-13 (White).

2.      Mrs. White currently receives in excess of $60,000 per year in pension and social security benefits. Hr'g Tr. (5/19/14) 41:24-42:14 (White). She is 75 years old. Ward Ex. 8.

3.      Ward's full name is Kenneth Maurice Middleton Ward. *Id.* 52:8-9 (Ward). He also goes by the names Kenneth Ward and Kenneth Middleton. When questioned by the Court

---

[1] To the extent that any finding of fact is more properly considered a conclusion of law, or a conclusion of law a finding of fact, it should be so considered.

[2] "Tr." refers to the Trustee's exhibits admitted into evidence at the Hearing, while "Ward" refers to the Wards' exhibits admitted into evidence at the Hearing.

[3] The name in parentheticals following a transcript citation reflects the party providing the referenced testimony.

at the Hearing, he was unable to adequately explain why he used so many different names. Hr'g Tr. (6/13/14) 90:3-92:15 (Ward).[4]

4. Ward testified that he has a degree in real estate and business management and is a notary public, as well as a decorated combat veteran, a former military engineer, and a former member of military intelligence. Hr'g Tr. (5/19/14) 52:6-53:3 (Ward). K. Ward Enterprises, Inc. ("**KWE**") is a company owned by Ward, his mother, and his brother. Hr'g Tr. (6/13/14) 26:19-20 (Ward).

5. According to her testimony, Maple-Ward[5] holds a degree in radio, television, and film. Hr'g Tr. (6/13/14) 111:20-25 (Maple-Ward). She also testified that she holds a degree in real estate and is a licensed realtor in the state of Texas. *Id.* Ward and Maple-Ward (f/k/a Angela Marie Maple) were married in 2006. Hr'g Tr. (5/19/14) 52:10-13 (Ward).

6. Mrs. White first met Ward in 2002. Hr'g Tr. (6/13/14) 42:19-43:7 (Ward). The Tulane Property (in which Mrs. White lived and continues to live) had been posted for foreclosure, and she responded to a mail solicitation received from Ward in relation to the posting. *Id.* (Ward). The Court details what happened in connection with this foreclosure *infra* at § B.

7. Initially, Mrs. White's relationship with Ward was a business relationship. However, over time, the relationship between Mrs. White and the Wards evolved into both a business and personal relationship. Hr'g Tr. (6/13/14) 65:18-67:14 (Ward).

---

[4] In general, Ward is not a credible witness. As explained in detail in these findings and conclusions, he has signed and filed false pleadings in several bankruptcy cases, his "story" changed frequently during the Hearing, and he instructed his wife to lie to the Trustee and Hunt about her relationship to Mrs. White and him. Without documentary evidence corroborating his testimony, the Court has grave concerns about the accuracy and completeness of his testimony.

[5] In general, Maple-Ward is not a credible witness. As explained in detail in these findings and conclusions, she has signed and filed false pleadings in several bankruptcy cases and she lied to the Trustee and Hunt about her relationship to Mrs. White and Ward. Without documentary evidence corroborating her testimony, the Court has grave concerns about the accuracy and completeness of her testimony.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**     3

8.      In 2010, Mrs. White became severely depressed. Hr'g Tr. (5/19/14) 24:25-25:5 (White). Due to neglect, the Tulane Property had become virtually uninhabitable, and Mrs. White attempted suicide by not eating or taking care of herself. *Id.* 24:25-25:5, 45:1-7 (White). Ward and one of Mrs. White's neighbors assisted Mrs. White in cleaning her home and transporting her to a hospital. *Id.* at 45:1-46:1 (White). Ward also discovered that Mrs. White was delinquent in her mortgage payments and that the Tulane Property was again posted for foreclosure. Hr'g Tr. (6/13/14) 71:21-72:8 (Ward).

9.      Prior to this time, Mrs. White was responsible for paying her own bills; however, after Mrs. White's suicide attempt, Ward began paying Mrs. White's mortgage with funds provided by Mrs. White. Hr'g Tr. (5/19/14) 45:1-20 (White).

10.     Also during this approximate time, Mrs. White had several knee surgeries that required extensive rehabilitation. Hr'g Tr. (6/13/14) 66:11-67:4, 78:7-14 (Ward); 144:14-145:18 (Maple-Ward). The Wards began taking care of Mrs. White's daily needs, such as transporting her to doctors, cleaning her home, picking up her groceries, taking care of other personal needs, and making the Tulane Property handicapped accessible. Hr'g Tr. (5/19/14) 43:20-44:10 (White); Hr'g Tr. (6/13/14) 78:5-16 (Ward). Mrs. White paid for these expenses with her personal funds, and the Wards received some compensation for their services. Hr'g Tr. (5/19/14) 74:16-76:7 (Ward).

11.     On July 15, 2011, while in the hospital, Mrs. White signed a general durable power of attorney (the "**Power of Attorney**") in favor of Angela M. Maple.[6] Ward. Ex. 7; Hr'g Tr. (6/23/14) 82:7-83:6 (Ward). The Power of Attorney expressly states that "THE ATTORNEY-IN-FACT [Maple-Ward], BY ACCEPTING OR ACTING UNDER THE

---

[6] There is no explanation in the record why the Power of Attorney named Maple-Ward as Angela M. Maple instead of Angela Maple Ward.

APPOINTMENT, ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT." *Id.* (emphasis in original). With the sole exception of the 2003 Warranty Deed on the Tulane Property, discussed below, Maple-Ward failed to disclose when it was her signing Mrs. White's name on a document under a power of attorney or otherwise signing Mrs. White's name on a document.

12. There is no evidence in the record that Ward held a similar power of attorney with respect to Mrs. White.

13. The testimony clearly showed that, beginning from approximately the time of Mrs. White's suicide attempt, the Wards controlled virtually all aspects of Mrs. White's life, including her finances. For example, all of Mrs. White's mail goes to a post office box that is checked by the Wards. Maple-Ward will bring Mrs. White "brochures and things like that," but no "business papers," which are instead given to Ward. Hr'g Tr. (5/19/14) 47:11-25 (White). Mrs. White cannot recall the last time she saw a bank account statement and does not check to verify that Ward is paying her mortgage as promised. *Id.* 41:2-6, 48:1-11 (White). In fact, she was unaware that she was behind on the mortgage payments for the Tulane Property, payments Ward was supposedly making with Mrs. White's funds. *Id.* 41:8-19. Indeed, Mrs. White only knows what bills are due based upon what the Wards tell her. *See, e.g., id.* 48:4-11 (White) (testimony regarding significant medical bills allegedly owing by Mrs. White that were not covered by Medicare). Further, although there was conflicting testimony on the topic, Mrs. White testified that Ward has authority to sign checks from her bank account. *Compare id.* 40:22-41:1 (White) ("Can [Ward] sign on [your bank account]? Yes."), *with id.* 58:25-59:2 (Ward) ("I've never handled her bank account.") *and* Hr'g Tr. (6/13/14) 145:19-22 (Maple-Ward) ("Do you have access to her bank account? I don't, no.").

14.     Throughout her testimony, Mrs. White stated that she had generally given the Wards permission to sign documents for her.  *See* Hr'g Tr. (5/19/14) 29:8-10 ("Well, I gave permission for Kenneth and Angela that signed [*sic*] the papers that need be, because I was unable to sign much of anything." ); 33:11 ("I'd given them permission to -- "); 35:21-22 ("No, I gave her my – I told her to sign things, as Kenneth did.  I don't remember seeing the papers."); 103:11-12 ("But I gave him permission to do so.").

15.     Based upon the testimony and other evidence presented at the Hearing, the Court finds that Mrs. White did not, and does not, fully appreciate and understand the actions that were taken by the Wards in her name, including the multiple property transfers and serial bankruptcy filings.[7]  Mrs. White was in a dire situation, and the Wards took advantage of her trust as detailed throughout these findings and conclusions.  *See, e.g.,* Hr'g Tr. (5/19/14) 41:17-23 (White) ("So did Mr. Ward ever tell you that he wasn't making your house payments? No, he did not.  He tries to protect me from anything….   He's like – he's like my son.  And he's tried to help me and protect me.").

16.     For example, the Wards presented bankruptcy documents to Mrs. White for signature while she was in the hospital and not capable of fully understanding what was happening.  As explained by Mrs. White:

> The time that I was in the hospital, they came every day. And sometimes they would have papers and I would try to read them and understand it. But I'm not sure that I did. I -- I hardly knew my own name. I knew enough to sign my name and ask Kenneth to help me. I knew that.

---

[7] Mrs. White was present for only a portion of the Hearing.  When she was excused, she asked if she could address the Court.  The Court allowed her to do so, and she asked the Court to not do anything to the Wards because she believed that they were always acting in her best interests.  This unsolicited statement from Mrs. White, however, only confirms the Court's view that she did not and does not (i) understand the business dealings she had with Ward and KWE, (ii) appreciate how the Wards have taken advantage of her – both financially and emotionally, and (iii) how the Wards have abused the trust she reposed in them.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**                                              **6**

Hr'g Tr. (5/19/14) 46:15-19 (White) (discussing documents filed in Mrs. White's current bankruptcy case).

17.     Accordingly, although the Wards argue that Mrs. White authorized and approved each instance where one of the Wards signed her name, such consent, if it was truly given, was not informed.   The record is replete with instances where Mrs. White was unaware that documents had been signed using her name or, when she was aware, the purpose of the documents had not been explained to her or the documents had been presented to her while she was hospitalized or otherwise not capable of making an informed decision.  Mrs. White's blanket statement that the Wards could do what was necessary to protect the Tulane Property[8] was not sufficient to give the Wards carte blanche to transfer and dispose of Mrs. White's assets, file bankruptcy petitions in Mrs. White's name, or sign documents (many of which contained false statements) without her knowing and her informed consent.

18.     While the Court appreciates the difficult situation that Mrs. White was in and remains in, and realizes that the Wards have provided at least some assistance to Mrs. White, the Wards have also taken advantage of her and have abused her trust as will be detailed throughout these findings and conclusions.

   **B.     The Tulane Property**

19.     The Whites purchased the Tulane Property, which has served as Mrs. White's residence, in 1975.  Tr. Exs. 1, 2; Hr'g Tr. (5/19/14) 36:19-20 (White).  Mr. White fell behind in his payment of income taxes and the IRS filed a federal tax lien against the Tulane Property in 1990.  Tr. Ex. 3.  The Whites then filed for protection under Chapter 13 of the Bankruptcy Code

---

[8] "I know we were trying to save my house [Tulane Property].  I asked Kenneth, I said, please whatever – I don't want to do anything illegal.  But I want to die in this house.  And when he took me to the hospital, when they found me on the floor he said, I will do all I can do so that you can be in this house at your death."  Hr'g Tr. (5/19/14) 31:10-15 (White).

in 1991, Bankr. Case No. 391-32279. Tr. Ex. 3A. The Whites completed their bankruptcy case, and the IRS released the tax lien on November 27, 1995. Tr. Exs. 3, 3A. The Affidavit of Heirship executed in relation to Mr. White's death states that no debts were owed when he died in 1998. Tr. Ex. 4.

20.     Following the death of her husband, Mrs. White became severely depressed and fell behind on her mortgage payments for the Tulane Property, which was posted for foreclosure in 2002. Hr'g Tr. (5/19/14) 24:25-25:24 (White).

21.     Mrs. White first contacted Ward in 2002 in response to a mail solicitation she received from Ward related to the posting. Hr'g Tr. (6/13/14) 42:19-43:7 (Ward). To avoid the foreclosure, an agreement was reached between Mrs. White and Ward for Ward, or a related entity, to purchase the Tulane Property. Hr'g Tr. (5/19/14) 25:22-26:6 (White). On January 22, 2003, Mrs. White signed a Power of Attorney (To Sell Property) in favor of Angela Marie Maple (now, Maple-Ward) to complete the sale. Tr. Exs. 7 (Power of Attorney (To Sell Property)), 8 (Warranty Deed).

22.     In furtherance of the agreement, the Tulane Property was sold to Ward and Gresham Morrison ("**Morrison**") on February 5, 2003. Tr. Ex. 8. The 2003 Warranty Deed was signed by Maple-Ward (f/k/a Angela Marie Maple) on behalf of Mrs. White. Tr. Ex. 8 (reflecting the signature "Nocona Friday White by Angela Marie Maple").

23.     Morrison financed the purchase of the Tulane Property, at least partially, with a $99,000 note payable to CTX Mortgage Company, LLC ("**CTX Mortgage**"). Tr. Ex. 9. In 2003, the Dallas County Appraisal District ("**DCAD**") valued the Tulane Property at $131,760. Tr. Ex. 15.

24.     The record does not clearly reflect the amount Mrs. White owed on the Tulane Property mortgage at the time of the sale.  During the Whites' 1991 joint bankruptcy, however, approximately $31,559 remained owing on the mortgage, Tr. Ex. 3A, page 7 (indicating claim owed to First Nationwide Mortgage), and there is no indication that additional amounts were borrowed by Mrs. White against the Tulane Property.  At the Hearing, Ward testified that Ward/Morrison paid off the debts on the Tulane Property, which he estimated at approximately $44,000, and paid Mrs. White $10,000.  Hr'g Tr. (5/19/14) 54:1-55:21 (Ward).  Although Ward claims he received no money from this transaction, the record is silent regarding application of the remaining amounts received under the loan.  *Id.*  Thus, based upon the record, it appears that Mrs. White sold the Tulane Property for only $54,000 ($10,000 cash, plus the payment of $44,000 in debt), losing $77,760 in equity ($131,760 DCAD appraisal minus the $54,000 allegedly paid to or on behalf of Mrs. White).

25.     After the sale, Mrs. White continued to live in the Tulane Property and paid rent to Morrison in the amount of Morrison's mortgage payment to CTX Mortgage.  Hr'g Tr. (6/13/14) 44:11-14 (Ward).   As explained by Ward, Mrs. White was given the option to repurchase the Tulane Property for $99,000, if the right was exercised within five years of the sale.  Hr'g Tr. (5/19/14) 56:4-13 (Ward); *see also id.* 26:4-21 (White).

26.     On March 6, 2003 Ward conveyed his interest in the Tulane Property to Morrison for no or nominal consideration.  Tr. Ex. 10 (listing consideration as "Ten Dollars ($10.00) and other good and valuable considerations").

27.     On April 16, 2007, Morrison sold the Tulane Property back to Mrs. White, who signed a promissory note for $140,000 payable to Pinnacle Financial Corporation, for which the Tulane Property served as collateral.  Tr. Exs. 11, 12.  So, it appears that Mrs. White paid

Morrison $140,000 for the Tulane Property, when she had been promised that she could repurchase it for $99,000.

28.     On June 4, 2007, Mrs. White then conveyed the Tulane Property to KWE, a company owned by Ward, for no consideration. Tr. Ex. 13; Hr'g Tr. (5/19/14) 56:21:24, 58:14-19 (Ward).   The only evidence adduced at the Hearing regarding the purpose of this transfer to KWE was by Ward, who explained that "she [Mrs. White] wanted me to oversee the [Tulane] property.  That was her means of making sure that if something happened to her, there wouldn't be a problem.  And that was her wishes."  Hr'g Tr. (5/19/14) 59:12-15 (Ward).

29.     Title to the Tulane Property remained in KWE from June 2007 to May 2, 2014 (shortly before the Hearing and after the Wards had retained counsel to represent them in connection with the Order to Show Cause), when KWE re-conveyed the Tulane Property to Mrs. White.   Hr'g Tr. (6/13/14) 39:1-4 (Ward).   Ward testified that he believes that the Tulane Property will be bequeathed to Maple-Ward upon Mrs. White's death under a will prepared near the time the Tulane Property was transferred from KWE back to Mrs. White.   *Id.* 39:1-12 (Ward).

30.     From the time of her repurchase of the Tulane Property in April 2007, Mrs. White remained (and remains) financially responsible for making the mortgage payments on the Tulane Property, notwithstanding the fact that title to the Tulane Property was in KWE's name for substantially all of that time period.  Hr'g Tr. (5/19/14) 58:5-59:15 (Ward).

31.     Beginning in 2010, KWE began paying the mortgage on the Tulane Property on Mrs. White's behalf, using Mrs. White's funds.  *Id.* 74:16-75:4 (Ward), 40:18-21, 43:19 (White). The record is not clear regarding whether Mrs. White would write a check to KWE in the amount of the mortgage or whether Ward would withdraw the amount from Mrs. White's checking

account. *Compare* Hr'g Tr. (5/19/14) 40:18-41:1 (White) (testifying that mortgage payments were made from her teacher's retirement funds deposited into her bank account, which Ward has authority to sign on), *with id.* 74: 13-15 (Ward) (testifying that that he does not have access to Mrs. White's bank account).

32.     Although money was paid to KWE for the mortgage on the Tulane Property, not all of the funds were passed along to Bank of America (the current mortgage holder on the property). Indeed, Ward testified that there were "five to six months" worth of mortgage payments that he deposited into KWE's account, but did pass along to Bank of America. Hr'g Tr. (6/13/14) 16:25-17:17:2. (Ward). After deducting amounts allegedly expended in maintaining or repairing the Tulane Property, Ward admitted that he (or KWE) owed Mrs. White $8,000 for funds Mrs. White paid to KWE, but which KWE failed to pay on account of the Tulane Property mortgage. *Id.* 16:5-17:2, 94:6-10 (Ward).

33.     On April 11, 2014, Bank of America filed Claim No. 2-1 in Mrs. White's bankruptcy case. Tr. Ex. 70. In its claim, Bank of America alleges that, as of August 1, 2013,[9] Mrs. White was $13,715.48 (ten months) in arrears on the Tulane Property mortgage, with the last payment having been made March 1, 2013. *Id.*

34.     In September 2012, the $140,000 note payable by Mrs. White on the Tulane Property became the subject of a Loan Modification Agreement. Tr. Ex. 14 (the "**2012 Loan Modification Agreement**"). The principal balance on the note was increased to $184,104.38, and the maturity extended through May 1, 2037, well beyond Mrs. White's life expectancy. *Id.* Notably, the 2012 Loan Modification was not signed by Mrs. White. Hr'g Tr. (6/13/14) 138:2-11 (Maple-Ward). Instead, the "Nocona White" signature appearing on the 2012 Loan

---

[9] The petition date of Mrs. White's current bankruptcy case.

Modification Agreement was signed by Maple-Ward; however, the document does not disclose that the signature is not that of Mrs. White. *Id.* Ward, using the name Kenneth Middleton, notarized 2012 Loan Modification Agreement. Tr. Ex. 14.

35. The 2012 Loan Modification Agreement, dated September 4, 2014, contains a representation that:

> There has been no impermissible change in the ownership of the [Tulane] Property since I [Mrs. White] signed the Loan Documents. A Permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce, or marriage.

*Id.* at ¶ 1(A). As of September 4, 2012, however, title to the Tulane Property was in the name of KWE, not Mrs. White. Tr. Ex. 13 (Warranty Deed in favor of KWE dated June 4, 2007); Hr'g Tr. (6/13/14) 39:1-4, 107:13-108:8 (Ward). So, Maple-Ward signed Mrs. White's name on the 2012 Loan Modification Agreement, which document (i) was signed by Maple-Ward without disclosure that the signature was not that of Mrs. White, (ii) was notarized by Ward who knew the signature was not that of Mrs. White, and (iii) that contained a false representation that the Wards knew was false at the time.

36. The Tulane Property was the subject of a further loan modification, which was approved by Bank of America on February 19, 2014 (the "**2014 Loan Modification**"). Ward Ex. 2. If approved by the Court,[10] the new principal balance on the Tulane Property Mortgage would be $176,437.27, with a maturity date of October 1, 2041, a date well beyond Mrs. White's life expectancy. The 2014 Loan Modification contains a representation that:

> There has been no impermissible change in the ownership of the [Tulane] Property since I [Mrs. White] signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow.

---

[10] The 2014 Loan Modification is subject to Court approval; however, as of the date hereof, no party has filed a motion requesting such approval from the Court.

*Id.* at ¶ 1(B). The 2014 Loan Modification also contains a deferred payment of $32,655.41, representing past due payments, fees, and expenses, which would not accrue interest and would be payable on the maturity date or upon a refinancing or pay off of the loan. *Id.* at 2; Hr'g Tr. (6/13/14) 39:21-25 (Ward). The record is unclear whether the loan modification was signed by Mrs. White or Maple-Ward. *Id.* 103:15-104:2 (Ward) (unsure whether Mrs. White or Maple-Ward signed); 139:11-17 (Maple-Ward) (cannot recall who signed).

37. As of February 19, 2014, the date the 2014 Loan Modification was approved by Bank of America, title to the Tulane Property was in KWE, not Mrs. White. Tr. Ex. 13 (Warranty Deed in favor of KWE dated June 4, 2007); Hr'g Tr. (6/13/14) 39:1-4 (Ward).

38. After the various transactions detailed above, the Tulane Property, which was the subject of no more than a $31,559 mortgage debt in 2003 (or no more than $44,000 if one believes Ward's version of the facts), is once again titled in Mrs. White's name, but is now the subject of the pending 2014 Loan Modification Agreement that would set the principal amount of the mortgage to $176,437.27. Other than amounts received by Mrs. White from the initial sale of the Tulane Property to Ward and Morrison, allegedly $10,000 in cash plus payment of approximately $44,000 in debt, Mrs. White has not benefitted from, or otherwise received the funds resulting from, the increased mortgage amounts.

39. The Wards actions with respect to the Tulane Property are merely some of the many examples of their taking advantage of Mrs. White's precarious situation and abusing the trust she reposed in them, both to Mrs. White's detriment and their personal gain.

### C. The Courtland Property

40. On March 1, 2007, Mrs. White purchased a home located at 3313 Courtland Place, Garland, Texas (the "**Courtland Property**"), and signed a promissory note in the amount

of $138,000 payable to Earth Mortgage, L.P. Tr. Ex. 16. Mrs. White then transferred the Courtland Property to KWE on June 4, 2007 for no consideration. Tr. Ex. 17. Mrs. White testified that she has never lived in the Courtland Property, but instead purchased the property in an attempt to save her true home, the Tulane Property. Hr'g Tr. (5/19/14) 30:8-12, 32:20-25 (White).[11]

41. The Courtland Property was posted for foreclosure in 2008 and a Chapter 13 bankruptcy was filed in Mrs. White's name to stop the foreclosure, although the property was titled in KWE's name at that time. Tr. Ex. 18; Hr'g Tr. (6/13/14) 56:23-57:13 (Ward). It was Ward, not Mrs. White, who signed the 2008 bankruptcy petition,[12] and Mrs. White testified that she was unaware that she had filed for bankruptcy in 2008. Hr'g Tr. (5/19/14) 29:18-30:7 (White), 61:7-15 (Ward). The 2008 bankruptcy petition was later dismissed for failure to file required paperwork. Tr. Ex. 19. The Courtland property was ultimately foreclosed upon. Tr. Ex. 20; Hr'g Tr. (5/19/14) 63:21-22 (Ward). Mrs. White, however, was unaware that the foreclosure had occurred. *Id*. 32:21-33:2.

42. The Court finds that Ward filed the 2008 bankruptcy petition in Mrs. White's name, without her knowledge or consent, in order to protect the Courtland Property – a property that was owned by KWE at the time the petition was filed and for which it paid no consideration. Ward's actions with respect to the Courtland Property are yet more examples of him taking advantage of Mrs. White's precarious situation and abusing the trust she reposed in him.

---

[11] It is unclear how anyone thought purchasing the Courtland Property and transferring it to KWE would prevent foreclosure on the Tulane Property.

[12] Although Ward's signature does appear on the petition, it is in his alleged role as "property manager" of the Courtland Property. Hr'g Tr. (6/13/14) 56:23-58:24 (Ward); Tr. Ex. 18.

**D.      The Kemp Street Property**

43.      Mrs. White inherited a home located at 214 N. Kemp Street, Mabank, Texas (the "**Kemp Street Property**") from a deceased relative.[13]  Hr'g Tr. (5/19/14) 36:23-37:17 (White); 87:9-14 (Ward).

44.      On September 29, 2007, Mrs. White conveyed the Kemp Street Property to KWE for $10,000.  Tr. Ex. 66.  According to Ward, he expended approximately $65,000 to $70,000 rehabilitating the property.  Hr'g Tr. (6/13/14) 19:16-18 (Ward).  Ward further testified that Mrs. White was to receive funds from the Kemp Street Property through rental or sale income.  *Id.* 18:20-19:8 (Ward) ("Well, she was going to get the [Kemp Street] property.  We were going to attempt to pay down the Tulane property with that property.").

45.      On November 2, 2007, KWE sold the Kemp Street Property to Lisa Breen for $112,000.  Hr'g Tr. (6/13/14) 19:12-15 (Ward).  Ward first testified on May 19th that he made no profit on the transaction.  Hr'g Tr. (5/19/14) 87:4-5 (Ward).  When pressed by the Court, however, he admitted that he made money on the sale, which he estimated at $29,000.  *Id.* 92:3-5 (Ward.)  At no time on May 19th did Ward testify that he shared any of the profits with Mrs. White.  *Id.*  91:9-92:12 (Ward).  At the continued Hearing, however, Ward changed his story and testified that he paid Mrs. White $10,000 from the sale proceeds, in addition to the initial $10,000 he paid to her when the Kemp Street Property was transferred to KWE.  Hr'g Tr. (6/13/14) 18:20-22:5 (Ward).

46.      To the contrary, Mrs. White testified that the Kemp Street Property had been fixed up and rented to a third party by Ward, but that the renters "destroyed the house" and it was then foreclosed upon by "whoever [Ward] borrowed the money to fix the house."  Hr'g Tr.

---

[13] The record does not disclose the date Mrs. White inherited the Kemp Street Property.

(5/19/14) 36:23-38:9 (White). Mrs. White testified that she never received any income or other money related to the Kemp Street Property. *Id.* 37:21-38:4 (White).

47. The Court did not find Ward's changing testimony regarding the Kemp Street Property credible, and was not persuaded that Mrs. White received any funds related to her transfer of the Kemp Street Property to KWE. Instead, this is yet another example of how Ward took advantage of Mrs. White's trust and her inability to manage her personal financial affairs.

### E. Mrs. White's Four Individual Bankruptcy Proceedings

#### a. In re Nocona White, 08-33947-BJH-13

48. As discussed above, Mrs. White purchased the Courtland Property on March 1, 2007, Tr. Ex. 16, and transferred the property to KWE for no consideration on June 4, 2007, Tr. Ex. 17. It does not appear that the mortgage company who financed Mrs. White's purchase was told of the transfer to KWE.

49. In 2008, the Courtland Property was posted for foreclosure. Hr'g Tr. (6/13/14) 56:23-57:13 (Ward). To stop the foreclosure, Ward filed a Voluntary Petition in Mrs. White's name, Case No. 08-33947, presumably because the mortgage company still thought Mrs. White owned the property and a bankruptcy filing in her name would stay the foreclosure. *Id.*; Tr. Ex. 18 (Voluntary Petition). KWE, not Mrs. White, however, held title to the Courtland Property at the time the case was filed. Hr'g Tr. (6/13/14) 30:21-31:5 (Ward).

50. The evidence showed that it was Ward who signed Mrs. White's name on the 2008 Voluntary Petition; however, Ward did not disclose this fact on the petition. *Id.* at 58:22-24; Hr'g Tr. (5/19/14) 61:7-15 (Ward).[14] At the Hearing, Mrs. White was presented with a copy of the signature page from the 2008 Voluntary Petition. She was unsure whether the signature

---

[14] Although Ward's signature does appear on the petition, it is in his alleged role as "property manager" of the Courtland Property. Hr'g Tr. (6/13/14) 56:23-58:24 (Ward); Tr. Ex. 18.

was her signature, and was not aware that she had filed for bankruptcy in 2008.  Hr'g Tr. (5/19/14) 29:18 – 30:7 (White).

51.    Further, in the 2008 Voluntary Petition, Ward listed Mrs. White's address as the Courtland Property and her telephone number as 214-288-0425.  Tr. Ex. 18.  Mrs. White, however, has never lived at the Courtland Property and the listed telephone number belongs to KWE.  Hr'g Tr. (5/19/14) 62:14-63:5 (Ward).  The 2008 Voluntary Petition was later dismissed for failure to file required paperwork, Tr. Ex. 19, and the Courtland Property was foreclosed upon, Tr. Ex. 20.  Per Ward, he let the 2008 bankruptcy petition be dismissed because "the [Courtland] property didn't mean anything to me."  Hr'g Tr. (5/19/14) 63:21-22 (Ward).  Mrs. White, however, was not aware of the foreclosure.  *Id.* 32:20-33:2 (White).

52.    The evidence showed that Ward, in bad faith and in furtherance of his own personal interests: (i) filed the 2008 Voluntary Petition in Mrs. White's name without her knowledge or consent; (ii) filed various documents with the Court in the 2008 bankruptcy case after signing Mrs. White's name to the documents without her knowledge or consent; and (iii) improperly commenced a bankruptcy case in Mrs. White's name to prevent foreclosure on a property titled in KWE's name.

      b.    <u>In re Nocona White, 10-33964-SGJ-13</u>

53.    On June 1, 2010, a second voluntary bankruptcy petition was filed by Ward under the name Nocona White, Case No. 10-33964.  Tr. Ex. 21.  Ward signed Mrs. White's name on the Voluntary Petition and the Statement of Social Security Number.  Hr'g Tr. (5/19/14) 64:3-65:9 (Ward).  Ward, however, did not indicate on these documents that it was him, not Mrs. White, signing the documents.  Tr. Ex. 21.  The Voluntary Petition listed Mrs. White's mailing

address as POB 830483 Richardson, Texas and her telephone number as 214-288-0425, but those are the address and phone number of KWE. Tr. Ex. 21; Hr'g Tr. (5/19/14) 64:3-16 (Ward).

54.     The June 1, 2010 Voluntary Petition was filed to prevent foreclosure on the Tulane Property. At that time, however, the Tulane Property was titled in the name of KWE, not Mrs. White. Tr. Ex. 13. Once again, it appears that the mortgage company was unaware of the transfer of the Tulane Property to KWE. This second case was dismissed on June 6, 2010 for failure to file paperwork. Tr. Ex. 22.

55.     At the Hearing, Mrs. White testified that she was aware that she had filed this 2010 bankruptcy case; however, she also testified that she (not Ward) had signed the Voluntary Petition. Hr'g Tr. (5/19/14) 30:13-21 (White). Ward, however, later admitted that he signed Mrs. White's name on the documents. *Id.* 64:3-65:9 (Ward).

56.     The evidence showed that, although Mrs. White was aware of the bankruptcy case, Ward in bad faith and in furtherance of his own personal interests: (i) filed various documents with the Court after signing Mrs. White's name to those documents and without disclosing that the signature was not that of Mrs. White; and (ii) improperly commenced a bankruptcy case in Mrs. White's name to prevent foreclosure on a property titled in KWE's name.

      c.    <u>In re Nocona White, 10-37052-SGJ-13</u>

57.     On October 4, 2010, a third Voluntary Petition was filed in Mrs. White's name, Case No. 10-37052. Tr. Ex. 23. Ward signed Mrs. White's name on the Voluntary Petition, but he did not indicate that it was him, not Mrs. White, signing the document. Tr. Ex. 23; Hr'g Tr. (5/19/14) 65:11-19 (Ward). Ward's signature also appears on the Voluntary Petition as a paid petition preparer. Tr. Ex. 23. Ward, however, testified that he was not paid for preparing the

petition. Hr'g Tr. (6/13/14) 76:19-23 (Ward). Thus, Ward falsely represented himself to be a paid petition preparer.

58. Once again, the October 4, 2010 Voluntary Petition was filed to prevent foreclosure on the Tulane Property. And, once again, title to the Tulane Property was in the name of KWE, not Mrs. White. Tr. Ex. 13. This case was dismissed on December 9, 2010, with prejudice to refiling for a period of one year due to Mrs. White's serial bankruptcy filings. Tr. Ex. 25. At the Hearing, Mrs. White testified that she was unaware that she had filed two bankruptcies in 2010. Hr'g Tr. (5/19/14) 31:5-10 (White).

59. The evidence showed that Ward, in bad faith and in furtherance of his own personal interests: (i) filed the second 2010 Voluntary Petition in Mrs. White's name without her knowledge or consent; (ii) filed various documents with the Court in the second 2010 bankruptcy case after signing Mrs. White's name to the documents without her knowledge or consent; (iii) signed the second 2010 Voluntary Petition as a paid petition preparer, despite his testimony that he was not paid to prepare the petition; and (iv) improperly commenced a bankruptcy case in Mrs. White's name to prevent foreclosure on a property titled in KWE's name.

       d.     <u>In re Nocona White, 13-33860-BJH-13</u>

60. The current bankruptcy case was filed in Mrs. White's name on August 1, 2013. Tr. Ex. 26. Ward signed Mrs. White's name to virtually all (if not all) of the documents filed with the Court in August 2013. Hr'g Tr. (5/19/14) 33:13-21 (White); 66:24-68:9 (Ward), Hr'g Tr. (6/13/14) 90:3-6 (Ward). Ward's name does appear (as Kenneth Middleton) on the Voluntary Petition, but as a paid petition preparer. Tr. Ex. 26; Hr'g Tr. (6/13/14) 90:3-11 (Ward). As before, Ward testified that he did not receive compensation for preparing the

petition. Hr'g Tr. (6/13/14) 76:19-22 (Ward). Thus, yet another false statement was made by Ward on documents he caused to be filed with the Court.

61. Maple-Ward also signed Mrs. White's name to documents filed with the Court in this case without disclosing that the signature was not that of Mrs. White, including the amended Voluntary Petition, Individual Debtor's Statement of Compliance with Credit Counseling Requirement, Declaration Concerning Debtor's Schedules, Verification of Creditors Matrix, Disclosure of Compensation of Attorney for Debtor, and Statement of Financial Affairs. Hr'g Tr. (6/13/14) 131:1-132:8 (Maple-Ward); Tr. Exs. 32A-32F. Indeed, Mrs. White did not sign any of the bankruptcy documents in her current bankruptcy case that were admitted into evidence at the Hearing, nor does she recall reviewing the documents with the Wards. Hr'g Tr. (5/19/14) 46:8-19 (White) 66:24-68:9 (Ward), Hr'g Tr. (6/13/14) 90:3-6 (Ward); 131:1-132:10 (Maple-Ward).

62. Neither Ward nor Maple-Ward listed on Mrs. White's bankruptcy Schedules or amended bankruptcy Schedules that Ward and/or KWE owes Mrs. White at least $8,000 related to unpaid mortgage amounts on the Tulane Property.[15] Tr. Exs. 29, 31B. Further, Mrs. White's Amended Schedule A, filed on October 9, 2013, lists her as owning the Tulane Property, despite the fact that KWE did not re-convey the property to Mrs. White until May 2, 2014, a few weeks prior to the Hearing on the Order to Show Cause. Tr. Ex. 31B; Hr'g Tr. (6/13/13) 39:1-4 (Ward).

---

[15] Ward admitted that either KWE or he had received mortgage payments from Mrs. White that were to be sent on to her mortgage company and that the payments had not been so sent. Rather, Ward kept the money and spent it. He estimated that he had taken and misused $8,000 of Mrs. White's money. Because the Court doubts the accuracy of the amount Ward admitted to taking and misusing, the Court directed that an independent third party be employed at the Wards' expense to review financial records of Mrs. White, KWE, and the Wards in order to determine the amount actually owed to Mrs. White by the Wards. On June 23, 2014, an application to hire Barry Tenenholtz was filed by the Wards' counsel, which was approved by this Court on July 23, 2014. That work is not yet complete.

63.     At the initial meeting of creditors held in this case, Ward appeared without Mrs. White and introduced himself to the Trustee as a friend of Mrs. White.  Hr'g Tr. (6/13/14) 9:25-11:6 (Ward).  He was advised by the Trustee that he must have a power of attorney before the meeting could proceed.  The meeting was then rescheduled.

64.     The Trustee, concerned that Mrs. White needed counsel, referred Ward to Hunt, who agreed to represent Mrs. White. Hr'g Tr. (5/19/14) 71:12-17 (Ward).  Ward also advised Hunt that he was a friend of Mrs. White, but he did not inform Hunt that he was the "Kenneth Middleton" who prepared the petition despite Hunt questioning his motives.  Hr'g Tr. (6/13/14) 10:12-22 (Ward).

65.     At the continued meeting of creditors held on January 23, 2014, Maple-Ward appeared without the Power of Attorney from Mrs. White.  Hr'g Tr. (6/13/14) 128:14-129:10. At that time, Maple-Ward advised the Trustee and Hunt**,** who attended the continued meeting as Mrs. White's counsel, that she was Mrs. White's granddaughter and wanted to help her.  *Id.* 128:19-22, 143:6-13 (Maple-Ward).  Maple-Ward, however, is not Mrs. White's granddaughter. *Id.* 128:23-25, 143:6-23 (Maple-Ward).  According to Maple-Ward, Ward had instructed her to say that she was Mrs. White's granddaughter.  *Id.*  143:12-144:5.  Maple-Ward further told the Trustee that she did not know who Kenneth Middleton was, despite being his wife. *Id.* 128:23-129:7 (Maple-Ward).  Thus, Maple-Ward lied to the Trustee and Hunt about her relationship with both Mrs. White and Ward.  When asked by the Court why she would lie about these things, she claimed that she did so because Ward had already told Hunt that she was Mrs. White's granddaughter and she was not aware of the severity of the situation.  *Id.* 143:6-144:12 (Maple-Ward).

66. After the January 23, 2014 meeting of creditors, Maple-Ward asked Hunt to dismiss Mrs. White's bankruptcy. *Id.* 140:10-15 (Maple-Ward). The request came not long after the 2014 Loan Modification covering the Tulane Property was approved by Bank of America. *Id.* (Maple-Ward).

67. It is clear to the Court that the Wards had become concerned that their real relationship with Mrs. White and their highly inappropriate conduct was about to be uncovered by either the Trustee or Hunt (or both), and the Wards wanted the bankruptcy case dismissed in hopes that their inappropriate, fraudulent, and abusive conduct would not become the subject of Court scrutiny. Hunt did not file the motion to dismiss requested by Maple-Ward.

68. Later during the case, Maple-Ward presented the Trustee with a Special Durable Power of Attorney for Real Estate Transactions dated January 30, 2014 with respect to the Tulane Property (the "**Durable Power of Attorney (Tulane)**"); however, it was Maple-Ward, not Mrs. White, who signed Mrs. White's name on the Power of Attorney, which Ward notarized as Kenneth M. Middleton. Hr'g Tr. (6/13/14) 130:3-22; Tr. Ex. 64.

69. The evidence showed that, although Mrs. White was aware of the current bankruptcy case: (i) Ward and Maple-Ward each filed various documents with the Court after signing Mrs. White's name to those documents and without disclosing that the signature was not that of Mrs. White; (ii) Ward signed the Voluntary Petition as a paid petition preparer, despite his testimony that he was not paid to prepare the petition; (iii) Ward improperly commenced a bankruptcy case in Mrs. White's name to prevent foreclosure on a property titled in KWE's name; (iv) the Wards failed to list the debt owed by Ward and/or KWE to Mrs. White on Mrs. White's bankruptcy Schedules and amended bankruptcy Schedules; (v) Ward failed to disclose to Hunt that he was the "Kenneth Middleton" who prepared the Voluntary Petition; (vi) Maple-

Ward misrepresented to the Trustee and Hunt both her relationship with Ward, her husband, and Mrs. White; (vii) Maple-Ward presented the Durable Power of Attorney (Tulane) to the Trustee without disclosing that she had signed Mrs. White's name to the document; and (vii) Maple-Ward signed the 2012 Loan Modification in Mrs. White's name, which Ward then notarized, without disclosing that Mrs. White did not sign the document. Further, when the 2012 Loan Modification was signed and notarized, the Wards knew that it contained a false representation regarding ownership of the Tulane Property. The Wards, individually and collectively, took these actions in bad faith and in furtherance of their own personal interests.

e.      The Maple-Ward Bankruptcies

70.      In addition to preparing the bankruptcy petitions involving Mrs. White, Ward also prepared two bankruptcy petitions in Maple-Ward's name. Hr'g Tr. (6/13/14) 116:24 (Maple-Ward); Tr. Exs. 35 (2009 Voluntary Petition), 36 (2010 Voluntary Petition).

71.      The first bankruptcy petition was filed in December 2009, listing the debtor as "Angela Marie Maple," not "Angela Maple Ward." Ward signed the Voluntary Petition on behalf of Maple-Ward without disclosing the fact that the signature was not Maple-Ward's, or that Maple-Ward and Ward were married at the time. Tr. Ex. 35 and 35 at Schedule I; Hr'g Tr. (6/13/14) 81:9-15 (Ward). Maple-Ward's 2009 bankruptcy documents also failed to disclose that she owned (i) a home at 8508 White Stallion in McKinney, Texas, Tr. Ex. 34 at Schedule A (Real Property); Tr. Ex. 36 (Proof of Claim); Hr'g Tr. (6/13/14) 118:8-11 (Maple-Ward), or (ii) a 2004 Chevrolet Tahoe, Tr. Ex. 34 at Schedule B, Line 25 (Personal Property); Tr. Ex. 38 (Proof of Claim); Hr'g Tr. (6/13/14) 125:13-18 (Maple-Ward). According to the Proof of Claim filed by GMAC Mortgage, LLC in Maple-Ward's bankruptcy, the mortgage on the White Stallion property was $54,804.25 in arrears as of December 2009. Tr. Ex. 36 (Proof of Claim).

72.    The second bankruptcy petition was filed in March 2010, listing the debtor as "Angela Maple."  Tr. Ex. 36.  Maple-Ward did personally sign her second bankruptcy petition. Tr. Ex 36; Hr'g Tr. (6/13/14) 123:1-2 (Maple-Ward).

73.    Both bankruptcy petitions listed Maple-Ward's residence as 11015 Ridgefrost Circle, Dallas, Texas 75228 (the "**Ridgefrost Circle Property**").  Tr. Exs. 35, 36.  Maple-Ward, however, has never lived in the Ridgefrost Circle Property, which was a rental property.  Hr'g Tr. (6/13/14) 121:17-23 (Maple-Ward).  According to Ward, the first bankruptcy petition was filed to protect the Ridgefrost Circle Property from foreclosure.  Hr'g Tr. (5/19/14) 81:9-25 (Ward).[16]  Notably, KWE owned a one-half interest in the property; however, the record is not clear as to when it acquired that interest.  Hr'g Tr. (6/13/14) 122:8-17 (Maple-Ward).

74.    Trustee's Exhibit 38 is a letter apparently signed by Maple-Ward[17] and filed in the 2009 bankruptcy case directing the Clerk of Court to change her mailing address from the Ridgefrost Circle Property to P.O. Box 830483, Richardson, Texas, which is the address used by KWE that is also listed on three of Mrs. White's four Voluntary Petitions.  Tr. Exs. 21 (Voluntary Petition dated June 1, 2010), 23 (Voluntary Petition dated October 1, 2010), 26 (Voluntary Petition dated August 1, 2013), 38 (Maple-Ward letter).

75.    The evidence showed that Ward and Maple-Ward engaged in bad faith conduct with respect to Maple-Ward's bankruptcy filings, including that:  (i) Ward filed the 2009 Voluntary Petition in Maple-Ward's name without disclosing that it was not Maple-Ward's signature on the document; (ii) Ward and Maple-Ward failed to disclose assets owned by Maple-Ward in her bankruptcy documents; (iii) Ward and Maple-Ward made false and misleading

---

[16] The record does not reflect the purpose behind Maple-Ward's second bankruptcy filing; however, based upon inclusion of the Ridgefrost Circle Property, it was presumably filed to, once again, protect that property from foreclosure.

[17] The record does not contain any evidence regarding whether the "Angela Maple" signature on Trustee's Exhibit 38 is that of Ward or Maple-Ward.

statements in documents they signed and caused to be filed by the Court, including failing to disclose the marriage between Ward and Maple-Ward and that the Ridgefrost Circle Property did not serve as Maple-Ward's residence.

> f.      The Breen Bankruptcy Petition

76.      Ward also signed and filed and a bankruptcy petition in the name of Lisa Breen, Case No. 10-34799. Tr. Ex. 48; Hr'g Tr. (6/13/14) 5:17-23 (Ward).[18]  In the Voluntary Petition, Ward listed Breen's residence as 1506 Forsythe Drive, Richardson, Texas and her mailing address as POB 830483, Richardson, Texas. *Id.* (Ward).   Lisa Breen, however, has never lived in Texas, and the mailing address on the petition is that of KWE. *Id.* 8:11-15 (Ward); Hr'g Tr. (5/19/14) 90:19-91:1 (Ward).

77.      The evidence showed that Ward engaged in bad faith conduct with respect to the Breen bankruptcy, including that he: (i) filed various documents with the Court after signing Breen's name to them without disclosing that Breen had not signed the documents; and (ii) made false statements in documents he signed Breen's name to and filed with the Court, including falsely stating that Breen resided in Texas.

## II.      CONCLUSIONS OF LAW

78.      Ward took advantage of Mrs. White and breached the trust that she reposed in him in a myriad of ways including, *inter alia,* (i) with respect to the Tulane Property, by: (a) convincing Mrs. White to sell the property to Morrison and him for inadequate consideration in 2003, (b) failing to honor the agreement that Mrs. White could repurchase the Tulane Property for $99,000 if done within five years of the 2003 sale, (c) after Mrs. White repurchased the

---

[18] Breen is an individual who purchased several properties from Ward and/or KWE, including the Mabank Property that Mrs. White believed had been foreclosed upon. Hr'g Tr. (6/13/14) 5:17 – 7:11 (Ward). The Court notes that the Mabank Property was subject to foreclosure, but the foreclosure occurred in 2010 after the property was sold to Breen. Tr. Ex. 69.

Tulane Property for $140,000 in 2007, convincing Mrs. White to transfer title to KWE for little or no consideration while Mrs. White remained personally and solely liable on the mortgage, (d) returning title to the Tulane Property to Mrs. White only after Mrs. White retained counsel and near the time that Mrs. White executed a will leaving the property to Maple-Ward upon her death, (e) failing to remit at least $8,000 in mortgage payments sent by Mrs. White to KWE or him for payment on the property's mortgage, (f) notarizing the 2012 Loan Modification when he knew both that Maple-Ward had signed Mrs. White's name on the document without disclosing that the signature was not Mrs. White's and that the document contained a false representation regarding ownership of the Tulane Property; (ii) with respect to the Courtland Property, by convincing Mrs. White to transfer the Courtland Property to KWE for no consideration; (iii) with respect to the Kemp Street Property, by: (a) convincing Mrs. White to transfer the property to KWE for little or no consideration, and (b) misrepresenting to Mrs. White that the Kemp Street Property had been damaged by renters and foreclosed upon when, in fact, Ward had sold the property to a third party for at least a $29,000 profit and failed to pay Mrs. White any of the sale proceeds; and (iv) presenting documents to Mrs. White for signature when she was incapable of understanding the ramifications of such documents, and then signing Mrs. White's name on those documents,[19] many of which contained false statements and/or were not in Mrs. White's best interests. These actions were contrary to Mrs. White's interests and were taken by Ward in bad faith and in furtherance of his personal gain.

79.     Maple-Ward took advantage of Mrs. White and breached the trust that Mrs. White reposed in her in a myriad of ways including, *inter alia*, by presenting documents to Mrs. White for signature when she was incapable of understanding the ramifications of such documents, and

---

[19] These documents include those filed in Mrs. White's 2013 bankruptcy case that were presented to her while she was in the hospital and, per her own testimony, incapable of comprehending the purpose or ramifications of such documents.

signing Mrs. White's name on those documents,[20] many of which contained false statements and/or were not in Mrs. White's best interests. These actions were contrary to Mrs. White's interests and were taken by Maple-Ward in bad faith and in furtherance of her personal gain.

80. Notably, despite the myriad of examples in the record to the contrary, Maple-Ward knew how to disclose it was her signing Mrs. White's name to a document. However, she only chose to do so on a single occasion in 2003. *See* Tr. Ex. 6 (Warranty Deed) (signed "Nocona Friday White by Angela Marie Maple").

81. Ward filed false pleadings in this Court, including, *inter alia*, (i) in Case No. 08-33947, the Voluntary Petition, to which he signed Mrs. White's name without her knowledge or consent; (ii) in Case No. 10-33964, the Voluntary Petition and Statement of Social Security Number, to which he signed Mrs. White's name without disclosing that the signature was not that of Mrs. White;[21] (iii) in Case No. 10-37052, the Voluntary Petition, to which he signed (a) Mrs. White's name without her knowledge or consent, and (b) his name as a paid petition preparer, despite his testimony that he was not paid to prepare the petition; and (iv) in Case No. 13-33860, (a) the Voluntary Petition, Application to Pay Filing Fee in Installments form, original Schedules, and Statement of Financial Affairs, to which he signed Mrs. White's name without disclosing that the signature was not that of Mrs. White,[22] (b) the Voluntary Petition, which he signed as a paid petition preparer despite his testimony that he was not paid to prepare the petition, and (c) Mrs. White's original Schedules, which failed to list the debt owed by Ward and/or KWE to Mrs. White. These actions were contrary to Mrs. White's interests and were taken by Ward in bad faith and in furtherance of his personal gain.

---

[20] These documents include those filed in Mrs. White's 2013 bankruptcy case that were presented to her while she was in the hospital and, per her own testimony, incapable of comprehending the purpose or ramifications of such documents.

[21] Mrs. White testified that she was aware of the first bankruptcy filed in her name in 2010.

[22] Mrs. White testified that she was aware of her current bankruptcy case.

82.    Ward also filed false pleadings in this Court with respect to the Maple-Ward bankruptcy cases, including the 2009 Voluntary Petition to which he signed Maple-Ward's name without disclosing that the signature was not that of Maple-Ward.  These actions were taken in bad faith and in furtherance of his personal gain.

83.    Maple-Ward filed false pleadings in this Court, including, *inter alia*, in Case No. 13-33860, (i) the amended Voluntary Petition, Individual Debtor's Statement of Compliance with Credit Counseling Requirement, Declaration Concerning Debtor's Schedules, Verification of Creditors Matrix, Disclosure of Compensation of Attorney for Debtor, and Statement of Financial Affairs, to which she signed Mrs. White's name without disclosing that the signature was not that of Mrs. White; and (ii) Mrs. White's amended Schedules, which failed to list the debt owed by Ward and/or KWE to Mrs. White.  These actions were contrary to Mrs. White's interests and were taken by Maple-Ward in bad faith and in furtherance of her personal gain.

84.    Further, although the language in the Power of Attorney appears broad enough to permit Maple-Ward to sign bankruptcy-related documents on Mrs. White's behalf, Mrs. White was not sufficiently informed regarding the bankruptcy for the Power of Attorney to shield Maple-Ward's actions, as the Court will now explain.  First, the Power of Attorney contains broad language granting Maple-Ward authority to act on Mrs. White's behalf with respect to the Tulane Property, tangible personal property, banking and financial transaction, claims and litigation, and other matters.  Tr. Ex. 7.  Although the authority to file a bankruptcy is not specifically listed, a court in this district has previously recognized that specific language is not required because "[p]owers of attorney must necessarily be drafted with an eye toward the future, and bankruptcy might not appear to be a possibility at the time of execution."  *In re James,* No. 05-46095-DML-7, 2005 WL 6443631 *2 (Bankr. N.D. Tex. Oct. 18, 2005).  More

notably, since the *James* case, the Fifth Circuit has held that "a general power of attorney may be used to file for bankruptcy on another's behalf." *U.S. v. Spurlin*, 664 F.3d 954, 959 (5th Cir. 2011). Although, the court acknowledged that for such a power to work there must be protections in place that prevent abuse, including "by requiring the debtor to be informed." *Id.* Thus, the Court concludes that the Power of Attorney was sufficient to grant Maple-Ward the authority to act as Mrs. White's agent, but there is nothing in the record indicating that Mrs. White was informed regarding the bankruptcy documents executed by Maple-Ward using her name. To the contrary, the evidence clearly showed that the documents were presented to Mrs. White while she was hospitalized and incapable of understanding what was happening. Moreover, the Power of Attorney expressly placed Maple-Ward in a fiduciary capacity with respect to Mrs. White. Thus, it was a breach of fiduciary duty for Maple-Ward to sign Mrs. White's name to documents that knowingly contained false statements, that were not in Mrs. White's best interests, and/or that served Maple-Ward's personal gain.

85.     Maple-Ward also filed false pleadings in this Court with respect to her 2010 bankruptcy case, including her Schedules that failed to disclose her ownership of various assets and her relationship with Ward. These actions were taken in bad faith and in furtherance of her personal gain.

86.     Ward made or participated in the making of various false and misleading statements with respect to Case No. 13-33860, including, *inter alia*, (i) failing to disclose to Hunt that he was the "Kenneth Middleton" who prepared the Voluntary Petition; (ii) directing Maple-Ward to misrepresent to the Trustee and Hunt her relationship with Ward and Mrs. White; (iii) notarizing the 2012 Loan Modification that was signed by Maple-Ward using Mrs. White's name, knowing Maple-Ward signed the document and that the document contained false

representations regarding ownership of the Tulane Property that Ward knew were false; and (iv) notarizing the Durable Power of Attorney (Tulane) that was signed by Maple-Ward using Mrs. White's name, knowing Maple-Ward signed the document. These actions were contrary to Mrs. White's interests and were taken by Ward in bad faith and in furtherance of his personal interests.

87.     Maple-Ward made various false and misleading statements with respect to Case No. 13-33860, including, *inter alia*, (i) misrepresenting to the Trustee and Hunt her relationship with Ward and Mrs. White; (ii) presenting the Durable Power of Attorney (Tulane) to the Trustee without disclosing that she had signed Mrs. White's name to the document; and (iii) signing the 2012 Loan Modification using Mrs. White's name, knowing that it contained a false representation regarding ownership of the Tulane Property that Maple-Ward knew was false. These actions were contrary to Mrs. White's interests and were taken by Maple-Ward in bad faith and in furtherance of her personal interests.

88.     As a sanction for his fraudulent and abusive conduct in filing bankruptcy cases in the Northern District of Texas, Ward should not be permitted to file any further bankruptcy cases in this District on his own behalf or on behalf of any other party without first seeking, and obtaining, authorization to file such a case by Order of the Chief Bankruptcy Judge in this District.

89.     Moreover, as a sanction for his fraudulent and abusive conduct in taking monies from Mrs. White for a specific purpose – *i.e.*, to pay to her mortgage company on her behalf, Ward should be required to return to Mrs. White all such monies that he admits to have taken and misused, without prejudice to Mrs. White or some other appropriate party acting on her

behalf suing Ward to recover other monies or damages suffered by Mrs. White by his fraudulent and abusive conduct.

90.     As a sanction for her fraudulent and abusive conduct in filing false pleadings in bankruptcy cases in the Northern District of Texas, Maple-Ward should not be permitted to file any further bankruptcy cases in this District on her own behalf or on behalf of any other party without first seeking, and obtaining, authorization to file such a case by Order of the Chief Bankruptcy Judge in this District.

91.     The Court reserves the right to supplement these findings of fact and conclusions of law as additional facts come to light.

### # # # END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW # # #